## A. D. RODDY v. STATE.

No. A-9976.    April 15, 1942.
(125 P. 2d 236.)

Harry G. Davis and Phil K. Oldham, both of Muskogee, for defendant.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Douglas Garrett, Co. Atty., of Muskogee, for the State.

BAREFOOT, P. J. Defendant, A. D. Roddy, was charged with the crime of murder in Muskogee county, was tried, convicted of the crime of manslaughter in the first degree and sentenced to serve a term of four years in the penitentiary, and has appealed.

The only contention made by defendant for reversal of this case is that the evidence was insufficient to sustain the verdict.

This charge grew out of the shooting and killing of Scott Noel in the city of Muskogee, Muskogee county, on the 17th day of December, 1939, by defendant. The shooting occurred in the Cozy Cafe, 217½ South Main street. The defendant and deceased had never met or known each other prior to the killing. By the testimony of Otis Marlow, who was working as a cook in the cafe and who was an eyewitness to the offense, the deceased, Scott Noel, was in the cafe sitting at one of the stools a little after 12 o'clock at night when the defendant, A. D. Roddy, entered the cafe. They were drinking beer and eating chili. He saw the defendant get up and leave and was gone approximately an hour when he returned about 2:30 o'clock. When he returned he and the deceased sat in the cafe for about 30 minutes. He was in the kitchen and

did not hear any conversation between them. Defendant got up and went out the front door and came back in about 10 or 15 minutes. He made a noise in opening the door and had a pistol in both hands. The defendant said, "Get, you son-of-a-bitch, I'm going to get you." He was pointing a pistol at the deceased, Scott Noel. That deceased ran toward an opening from the cafe into the kitchen. That just as he entered the kitchen from the opening he was shot by defendant in the back. That he saw the defendant leave the cafe immediately after the shooting by the front door. That his car was parked near the cafe.

Grover Whittenburg, a witness for the state, testified that he and Lawrence Dilbeck came to the Cozy Cafe about 2 o'clock. That he saw the deceased, Scott Noel, sitting there and he and defendant were talking. They were at the end of the counter near the door that opens on to the main street. He and Dilbeck were near the center of the counter. He heard the defendant and deceased arguing over who would pay for the beer they were drinking. He further testified that defendant twice started to leave and deceased told him to sit down each time and tried to get him to drink the beer. That defendant left, taking with him his bottle of beer. The deceased walked down to the lower end of the counter, and defendant returned in about ten minutes. He testified:

"A. I heard him when he sort of jarred the door and came in, and after he came in he said, 'You better get, you son-of-a-bitch, or I'll get you'".

He had in both hands a 38 automatic pistol, which he was pointing toward the deceased, who ran toward the opening between the cafe and the kitchen and was shot by defendant in the back as he entered the passageway.

Lawrence Dilbeck corroborated in a substantial way the testimony of the witness Whittenburg. He saw the parties in the cafe and heard them quarreling over who should pay for the beer and saw the deceased push the defendant down on a stool when he started to leave, and heard the defendant say something about being run over. His evidence with reference to the defendant returning to the cafe and shooting the deceased as he ran out of the door into the kitchen was practically the same as the evidence of the witnesses Marlow and Whittenburg. He said he did not hear the statement made by defendant just before the shot was fired as stated by these witnesses, and that he did not see deceased at the time the shot was fired, as he was looking toward defendant. He also testified that when he went out on to the sidewalk defendant was there and tried to get him to leave with him in the car, but he refused, and defendant got in his car and drove away.

W. E. Franklin was the cashier and waiter at the cafe. He waited on the defendant and deceased and saw the conduct of the parties from the time of their entrance into the cafe until the time of the shooting. His testimony was in accord with that of the witnesses heretofore stated. He testified that there were no blows struck by either defendant or deceased prior to the shooting. He saw the defendant enter the cafe with a pistol in both hands and saw him shoot deceased in the back as he ran into the kitchen.

Several officers testified for the state. Their evidence is immaterial so far as the issues are here concerned.

Dr. John Rafter testified to the death of the deceased, Scott Noel, by reason of the gunshot wound.

Defendant offered numerous witnesses who were prominent citizens of Muskogee who testified to the good char-

acter and reputation of defendant and that he had worked
for the K., O. & G. and Midland Valley Railroads for
many years, and also witnesses who testified that the
deceased was a quarrelsome, troublesome person and that
his reputation for such was bad.

Defendant testified that he was a locomotive fire-
man and had been for many years. That he went to the
Cozy Cafe on the night of the 17th of December, 1939,
as testified to. That it was the first time he had ever
been there. That he went in there to get something to
eat. That he sat down on one of the stools at the counter
and ordered a glass of beer and a bowl of chili. That de-
ceased was sitting near him. He had never met deceased
before and did not know anyone else in the cafe. He
testified the deceased engaged him in conversation and
asked him if he wanted to make some money during Christ-
mas. That you could do so by dealing poker, as he was
a good one and knew how to deal from the bottom. That
he had done this in Joplin, Mo. He said that he told
him he did not want to do anything like that, as he was
a railroad man and did not do those things. He said
he started to leave and deceased asked him to pay for
the bottle of beer and that he agreed to do so, but when
he started to pay he did not have money enough and that
he told the chasier, Franklin, he would go home and get
the money, and Franklin said to him, "You aren't going
to try that on me, are you?" and they had some words,
but that he went out and on home to get the money.
That up to this time there had been no harsh words be-
tween him and the deceased, no disagreement or dispute
of any kind. He went to his home and secured a roll
of coins like they wrap it in a bank, put them in his pocket
and went back to the cafe. He had walked home, but
when he came back he came in his car. He walked up
to the counter and saw the deceased. Defendant took

his roll of money from his pocket and paid for the beer. He had $10 in 50 cent pieces that were rolled in a package, which he laid on the counter. After Franklin had given him the change, he said the deceased swung him around and said, "You are going to buy me another bottle of beer, aren't you?" He told Franklin to give the deceased another bottle, and deceased said, "Buy yourself one," which he did, and that two bottles of beer were placed on the counter and he paid for them. He then testified that deceased claimed he had not paid for the beer and that Franklin said that he had not, and he stated, "What are you fellows trying to do, bull-doze me?"

He further testified that deceased took a firm grip on his arm and said, "Look here, old man, I'll box the piss out of you." That deceased had hold of him during all of the time and was trying to take his money from him. That deceased was trying to get him to drink the beer which the witness Franklin had brought in a glass, and he figured it was doped, and that deceased said to him, "You drink it or I'll break your God-damn neck." That in the scuffle the beer was spilt on the counter and on his clothes. He said, "Well, I got hold of my money, a part of it, and put it in my jacket pocket; I don't know how much, but I couldn't watch my money and watch Franklin and Noel all at the same time."

He further testified that deceased jerked him down on the stool several times, and that finally he went out the front door of the cafe with the bottle of beer in his hand. That he looked up and down the street for an officer and when he could not see one he decided to arrest the deceased himself. The witness here became confused in his testimony, but testified that he went to his car and sat there for a minute or two, and after counting his money came to the conclusion he had been robbed,

and he decided to return to the cafe and arrest the defendant. That he took his gun from the glove compartment of the car and entered the cafe with it in his hand. His testimony of the actual shooting was as follows:

"Q. Just tell the jury what took place then? A. I walked in the door and Noel was walking down towards the west end of the counter probably within about three stools of the end of the counter and I started down that way and said, 'I'm going to arrest you, I'm going to arrest you,' and he kept on walking and I said, 'Come on, let's get going.' Q. What did he do then? A. He whirled; he made a quick whirl. Q. Say that this is the east end of the restaurant and this is the west end and this is the row of stools, along here, just show the jury how that took place? A. Well, he was down like this and then he whirled. Mr. Garrett: I want the record to show that he put his left hand behind him first and then put his right hand behind him next. Q. Where was his right hand when he whirled? A. Well, his body was between me and him but I thought he was reaching for a gun. Mr. Garrett: I object to what he thought; he can testify as to what he saw or what the man did. The Court: Overruled. Q. You say you thought he had a gun? A. Yes sir, I thought he had a gun and was going to shoot me. Q. What did you do? A. I raised up the gun and fired. Q. What did he do when you fired? A. He went around the counter and went on out. Q. Did you believe at that time that he would kill you? A. Yes, sir. Q. You say he went where? A. He disappeared out through the kitchen; I never was back there and I don't know exactly where he went. Q. What did you do then? A. I went on out in front."

He then testified that he got in his car and went home and placed his gun in the dresser drawer, and afterwards went to the sheriff's office and surrendered.

We have stated at length the testimony of the defendant. It is so at variance with every eyewitness to this homicide who testified for the state that it will be

readily observed that a question of fact was presented for the consideration of the jury. It was for them to say where the truth lay. They had an opportunity to observe the witnesses and to see their demeanor upon the witness stand, and under the well-recognized rule of this court, that we will not interfere with the verdict of the jury where there is a conflict in the evidence, and where the evidence of the state is sufficient to uphold the verdict and judgment, under the evidence of the state a judgment and sentence of murder would be upheld. No doubt the jury took into consideration the previous good character and reputation of the defendant when they only found him guilty of manslaughter in the first degree and assessed his punishment at the minimum of four years in the penitentiary.

Finding no error in the record, the judgment and sentence of the district court of Muskogee county is affirmed.

JONES and DOYLE, JJ., concur.